UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CITY OF BUFFALO

Plaintiff,

vs.

UNITED STATES DEPARTMENT OF THE INTERIOR
1849 C Street, N.W., Washington, DC 20240;

DOUG BURGUM, in his official capacity as United States Secretary of the Interior
1849 C Street, N.W., Washington, DC 20240;

BUREAU OF INDIAN AFFAIRS
1849 C Street, N.W., Washington, DC 20240;

WILLIAM KIRKLAND, in his official capacity as Assistant Secretary for Indian Affairs
1849 C Street, N.W., Washington, DC 20240; and

UNITED STATES OF AMERICA
138 Delaware Avenue
Buffalo, NY 14202

Defendants.

---

Civil Action No.

**COMPLAINT**

**Jury Trial Demanded**

The City of Buffalo, for its Complaint against the United States Department of the Interior; Doug Burgum, in his official capacity as United States Secretary of the Interior; the Bureau of Indian Affairs; William Kirkland, in his official capacity as Assistant Secretary of Indian Affairs, and the United States of America, alleges:

## Preliminary Statement

1. The City of Buffalo brings this action under the Administrative Procedure Act to annul an arbitrary, capricious, and facially defective decision by the Department of the Interior (the "DOI"). At the request of the Seneca Nation of Indians ("SNI"), the DOI decided a waterfront parcel at 5 Miami Street (the "Site") in Buffalo's Old First Ward could be removed from the City's tax rolls and held by SNI in restricted fee (the "Decision").

2. SNI submitted the request on or about December 21, 2022. DOI stamped its Decision of "yes" about six weeks later, on February 14, 2023.

3. The Decision relied on the Seneca Nation Settlement Act of 1990. Pub. L 101-503, 25 U.S.C. § 1774 ("SNSA" or the "Act") as its sole legal authority.

4. But, as explained below, the Act does not and could not apply to the Site, or to SNI's "purchase" of the Site from its wholly-owned gaming corporation.

5. In September 2026, SNI revealed its purpose for seeking restricted fee status: to build a truck stop on City waterfront property without local or State approval.

6. Regardless of the use that SNI has planned for the Site, however, the SNSA simply does not apply here, and the Decision should be vacated.

7. Congress passed the Act in 1990 to resolve disputes between the SNI and the residents in and around Salamanca, New York, prompted by the expiration of long-term leases of land near the SNI Allegany Reservation.

8. The Act appropriated $65 million in federal and New York State funds ("SNSA Money") to "assist in resolving the past inequities involving the 1890 leases and to secure fair and equitable compensation for the Seneca Nation." SNSA, § 2(b)(2).

9. The SNSA Money was a finite sum composed of $19 million for economic

and community development, and $46 million "to further specific objectives of the [SNI]" including the acquisition of land within SNI's aboriginal area. SNSA §§ 6, 8(c).

10. Under explicit statutory conditions, land acquired with SNSA Money could be held in restricted fee instead of fee simple. If those conditions were met, the Act permitted SNI to ask the Department of the Interior to authorize holding the land in restricted fee status, thereby placing the land under protection of the federal government and preventing the subsequent sale of the land without federal approval.

11. The conditions were as follows: first, SNI's acquisitions must be on its aboriginal territory of SNI, or within or in close proximity to its former reservation land, as defined in the Act.

12. Second, the SNSA applied only to purchases *made using the SNSA Money*. That is, only a purchase of land using the discrete sum of $46 million earmarked for land acquisition could trigger its application to an acquired parcel. Settlement Act, § 6(e).[1]

13. Therefore, once the SNSA Money was exhausted, further acquisitions would not be eligible for restricted fee status.

14. SNI exhausted the SNSA Money to acquire land used to build casinos in Buffalo and Niagara Falls, except for $5 million explicitly set aside to acquire land "to meet the housing needs of the Nation's members." This is spelled out explicitly in the 2002 Gaming Compact (the "Compact") between SNI and the State of New York.

15. Under the Compact, SNI agreed that all remaining SNSA Money would be used to buy two parcels in Western New York—one in Niagara Falls, one in Buffalo—

[1] "Limitation – The only amounts available to carry out this Act shall be those amounts specifically appropriated by the Congress or the legislature of the State to carry out this Act."

to build a casino on each parcel. Under the Compact, SNI agreed this would be the last land acquisition under the Act, and promised to dedicate the remaining $5 million to pay for housing on reservation land. **Exhibit 1** is the Compact, including a cover letter by the Secretary of the Department of the Interior "allow[ing] this Compact to take effect." *See* Ex. 1, p. 1.

16. In addition, the Compact provided that any housing land purchased with the remaining $5 million "shall be physically and immediately contiguous and adjacent to" an "existing reservation" or one of the casino parcels purchased under the Compact. *Id.* § 11(c).

17. Therefore, apart from a housing development for members of the Seneca Nation, the Compact foreclosed the purchase and designation of additional restricted fee land under the Settlement Act.

18. But then, twenty years later, in December 2022, SNI claimed that it had again used SNSA Money, this time to acquire the Site. According to the November 2022 deed, the Seneca Nation "bought" the Site from the Seneca Erie Gaming Corporation—*i.e.*, a "government instrumentality of the Seneca Nation of Indians."[2] In other words, SNI purchased the Site from itself. To claim restricted fee status for this purchase, SNI informed the DOI that it transferred the purchase-money from a "Settlement Act" account into a "Seneca Niagara Falls Gaming Corporation" account. *See* Ex. 2, p. 2.

19. Accepting this representation wholesale, the DOI allowed the Site to pass into restricted fee status by decision dated February 14, 2023. **Exhibit 2** is a copy of the Decision.

[2] Ex. 5, p. 2. The quitclaim deed from Seneca Erie Gaming Corporation to the Seneca Nation of Indians, recorded in the Erie County Clerk's Office on November 30, 2022, is attached as **Exhibit 5**.

20. The DOI did so without even a passing comment on the terms of the Compact—which expressly required SNI to use all but $5 million of the SNSA Money to buy casino land—despite the DOI Secretary having personally reviewed, analyzed, and permitted the Gaming Compact to take effect. *See* Ex. 1, p. 1 (noting that the Compact "reserv[ed] five million dollars for housing adjacent to gaming sites").

21. The DOI ignored these defects in rendering the Decision.

22. On information and belief, the DOI did not announce, publish, or communicate its Decision to the City.[3]

23. Through the foregoing maneuvers, the Site was purportedly clipped from the City's tax roll and declared to be restricted fee territory.

## **Description of Action and Relief Sought**

24. This action challenges the Decision by the DOI that the Site was or is eligible for restricted fee status under the Act.

25. The City seeks review under the Administrative Procedure Act because the Decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law; was contrary to the requirements of the SNSA; in violation of procedures required by law; unwarranted by the facts; and in excess of the lawful authority of the Department of the Interior. 5 U.S.C. § 702.

26. DOI failed to conduct a substantive review of the Act or its legislative history, relevant facts, the procedural record, or even documents propounded by DOI itself, and allowed the Site to pass into restricted fee status on or about February 14, 2023. Ex. 2.

[3] On information and belief, the City did not receive a copy of the DOI's decision until September 28, 2026, when counsel for SNI sent it to the City's attorneys via email.

27. This Decision was and is arbitrary, capricious, not in accordance with law, and an abuse of discretion because it contradicts the explicit requirements of the Act.

28. SNI's acquisition of the Site did not meet an explicit legal condition for restricted fee status under the Settlement Act because it was not purchased with the finite sum of SNSA Money.

29. The Decision was arbitrary and capricious, not in accordance with law, and made without due consideration of the administrative record, because, on information and belief, the Site is not located in SNI's "aboriginal area in the State," nor is it situated "within or near proximity to former reservation land," as defined in the Act.

30. The Decision was also contrary to law because it violated the Compact between the State of New York and the SNI.

31. The City seeks to vacate the Decision and asks for a declaration that the Decision was arbitrary, capricious, and contrary to law because:

i. the Site does not satisfy the eligibility requirements of the Seneca Nation Settlement Act of 1990;

ii. the Notice by which the Site was put in restricted fee was defective in failing to put the City on proper notice of the specific parcel of land, the basis for claiming eligibility under the Act, or the substantive record being submitted to the DOI; and

iii. the Decision violates the Compact between the SNI and New York State.

32. In addition, the Decision portends a thicket of perpetual challenges to local jurisdiction. Here, SNI expressly agreed to terms of finality under the Compact—averring that all SNSA Money was exhausted—only to claim the SNSA Money was somehow restored two decades later. On that basis, SNI claimed it can add more restricted fee land to its holdings, with no apparent limit. If this process were valid,

there would be no limit to SNI employing the same tactic again, and again, in perpetuity.

33. The City respectfully seeks declaratory relief confirming that the Decision violated the SNSA and the Site is under the regulatory jurisdiction of the City of Buffalo.

## **Jurisdiction**

34. This Court has jurisdiction over this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and Article III Section 1 of the Constitution of the United States. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and may issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

35. The Decision constitutes a final agency action within the meaning of 5 U.S.C. § 704. The Decision was the final act by the DOI and its Bureau of Indian Affairs regarding SNI's application, and there is no other adequate vehicle available for review of the Decision. The Decision is therefore a final agency action reviewable under the Administrative Procedure Act. *Id.*

## **Venue**

36. A substantial part of the events giving rise to the claim occurred within the Western District of New York and the Site at issue is within the geographic boundary of the Western District of New York. Therefore, venue is proper in this district. 28 U.S.C. § 1391(b)(2).

## **Parties**

37. The City of Buffalo is a municipal corporation organized and existing under the laws of the State of New York, with its principal offices located at 65 Niagara

Square, Buffalo, New York 14202.

38. The Site is located in Buffalo, New York.

39. The United States Department of the Interior is an agency of the United States.

40. Doug Burgum is the United States Secretary of the Interior.

41. The Bureau of Indian Affairs is a division of the United States Department of the Interior.

42. William Kirkland is the Assistant Secretary of the Bureau of Indian Affairs.

43. Doug Burgum and William Kirkland are responsible officers of the United States with representative authority for the Decision challenged herein.

## Standing

44. The Decision classifying the Site as restricted fee inflicts a concrete legal injury on the City of Buffalo, its residents, and the physical environment.

45. On information and belief, SNI submitted an application to the DOI to place the Site into restricted fee under the Settlement Act on or after December 21, 2022. **Exhibit 3** is the letter dated December 21, 2022, from the Seneca Nation of Indians to then-mayor of Buffalo, Byron Brown, stating that SNI "was prepared" to submit the Site to the DOI for restricted fee status under the Act.

46. On information and belief, the DOI rendered a Decision dated February 14, 2023, finding the Site could be reclassified as restricted fee. *See* Ex. 2.

47. The Decision impairs the City's regulatory, zoning, and police power over land inside its geographic boundaries.

48. The City is burdened by the consequences of activity at the Site following the Decision. The Site abuts local businesses, City streets, and public parkland. Development at the Site will burden City resources, impact the environment, and strain police and fire employees in executing an effective response to emergencies.

49. SNI's plan to put a truck stop at the Site illustrates one manifestation of harm to the City. Putting a massive gas station in South Buffalo near a waterway and water resource, without accepting regulation or input from the City (or, through the City, the State of New York), will harm the City and its citizens immediately and irreparably. For instance, the project would cause: (i) a dramatic increase in local and cross-border traffic by heavy commercial vehicles seeking tax-free gasoline and other cut-rate goods; (ii) harm to local businesses who cannot compete with a tax-exempt gas station; (iii) blight to the surrounding greenspace, restaurants, and event venues; (iv) burdens on the Buffalo police, fire, water, sewer, and public works departments, including physical erosion of local roadways; (v) disturbances to remediation controls that were built into the Site through decades of work and millions of dollars invested in related brownfield mitigation measures; and (vi) lost tax revenue.

50. Vacating the Decision would confirm the City's tax authority over the Site and preserve the City's control over local infrastructure and utility services, and restore local control necessary to execute on the City's strategic plan.

## Facts

### A. The Site is located on greenspace in the First Ward, next to the Buffalo River, bordered by local businesses and City infrastructure

51. The Site at 5 Miami Street is a 3.8-acre parcel in the First Ward neighborhood in downtown Buffalo, New York.

52. To its west and south along Ohio Street, the Site abuts a public park (River Fest Park) and a wedding and special events venue (Tewksbury Lodge), both sitting immediately next to the Buffalo River.

53. To the east along Chicago Street is a restaurant, bar, event venue, and brewery (Resurgence Brewery, Catering, and Event Center; Hartman's Distilling) rock-climbing gym (Central Rock Gym) and another public park with a baseball diamond and playground (Conway Park).

54. The Site is immediately bordered by City-owned Ohio Street and Chicago Street.

55. The Site is not on an SNI reservation.

56. On information and belief, the Site has been under the regulatory jurisdiction and authority of the City of Buffalo and State of New York for more than a century.

57. On information and belief, an iron works plant occupied the Site in the mid-1800s.

58. In or around 1947, Lincoln Storage and Carting owned the Site.

59. Lincoln Storage was later known as "Boss-Linco Lines, Inc.", which owned the Site until 1963.

60. On information and belief, Modern Terminals, Inc. acquired the Site in 1963, followed by Laidlaw Transport (by deed in 1981) and Ramcol Fibres, Inc. (by deed in 1984).

61. These businesses (and surrounding parcels in the First Ward) were subject to the local laws and powers of the City.

62. The Seneca Erie Gaming Corporation purchased the Site from Ramcol

Fibres, Inc. for $309,000 in 2007. The City continued to exercise jurisdiction and control over the Site with Seneca Erie Gaming Corporation as owner.

63. Then on or about November 30, 2022, SNI acquired the Site from the Seneca Erie Gaming Corporation—with the Gaming Corporation described on the deed as a "government instrumentality" of SNI itself. Ex. 5.

64. On information and belief, SNI applied for restricted fee status just three weeks later on or about December 21, 2022.

65. SNI purportedly sent this notice letter one day after the infamous "Buffalo Blizzard" of 2022 set in, which essentially shut down the City of Buffalo.

66. On information and belief, following the 2022 acquisition through September 2026, SNI exercised no physical control over the Site; to the contrary, the Site continued to exist as part of the land of the City of Buffalo, benefitting from City infrastructure, services, and parkland.

### B. Under the 2002 Gaming Compact between SNI and the State of New York, SNI agreed and elected to spend all remaining SNSA Money on two casino sites in Western New York.

67. In 2002 SNI entered into an agreement with New York State that granted SNI exclusive rights to operate casinos in Western New York. *See* Ex. 1, the Compact.

68. Under the Compact, SNI was permitted to build and operate a casino at one location in Niagara Falls and one location in Buffalo. Ex. 1, § 11(a)(1)-(2).

69. Under Section 11(2)(b)(4) of the Compact, SNI agreed to "use all but $5,000,000 of the funds remaining under the Seneca Nation Settlement Act to acquire" the two casino parcels. *Id.*, p. 35, § 11(b)(4).

70. SNI did expend all remaining SNSA Money on the two casino parcels, one of which was in the City of Buffalo at 1 Fulton Street, where the Seneca Buffalo

Creek Casino is now located.

71. The Compact further provided that "Host Municipalities" should be compensated "to be able to adjust to the economic development expected to result from the Gaming Facilities authorized under this Compact." Ex. 2 § 11(d).

72. In October 2006, SNI entered into an agreement with the City of Buffalo concerning the construction and operation of the casino in Buffalo, New York. **Exhibit 4** is the 2006 Agreement between SNI, the Seneca Gaming Corporation, and the Seneca Erie Gaming Corporation, and the City of Buffalo (the "2006 Agreement").

73. Under the 2006 Agreement, the City agreed to provide police, fire, sewer, and water services for the casino, and SNI agreed to a pay a certain percentage of revenue as the "Host Municipality" per the terms of the Gaming Compact. Ex. 4, § 4(b)-(e).

74. The municipal services the City agreed to provide to the casino were limited to the "Seneca Buffalo Creek Territory" as defined in the 2006 Agreement, *i.e.*, the nine-acre parcel purchased to build and operate the Seneca Buffalo Creek Casino. Ex. 4, §§ 1(t) and 4(b)-(e). The City did not agree to provide such service to any other area or site.

75. SNI separately agreed under the 2006 Agreement that it would cooperate with the City's environmental review in accordance with New York's State Environmental Quality Review Act (or "SEQRA"). *Id.* § 5.

76. SNI also affirmed its "good faith" intent that, "consistent with the [Gaming] Compact, except for the Seneca Buffalo Creek Territory, no land in the City of Buffalo will be acquired utilizing the provisions of the Seneca Nation Land Claims Settlement Act to implement Compact requirements, including requirements of any

successor compact, to build and construct their class III gaming operation in the City of Buffalo." Ex. 3, § 9(c).

77. The 2006 Agreement provides that "the Provisions of Section 9(c) of this Agreement shall survive the termination or expiration of this Agreement." *Id.* § 11(l).

**C. The DOI Decision concerning the Site**

78. The Settlement Act defines "Seneca Nation" as the "Seneca Nation of Indians of the Allegany, Cattaraugus, and Oil Springs Reservations."

79. The Settlement Act appropriated $65 million in settlement funds. This sum was finite; the Act does not provide for renewal or replenishment of the funds.

80. The Settlement Act set conditions on the use of SNSA Money.

81. Between funds provided by the federal and state governments, the Act appropriated $46 million that could be used for land acquisition. *Id.* § 1774d.

82. Land that was purchased with this discrete sum, and meeting the geographic conditions specified in the Act could, if approved by the Department of the Interior, "be held in restricted fee status" subject to the provisions of the Non-Intercourse Act. *Id.* (citing 25 U.S.C. § 177). "Restricted fee" status under the Non-Intercourse Act prohibits any future conveyance of land without prior approval of the federal government by treaty.

83. Again, SNI confirmed under the Compact that all such SNSA Money then remaining would be used either on the purchase of its casino properties in Niagara Falls and in Buffalo, or to acquire housing lands for its native members. Ex. 1, §11(c).

84. SNI exhausted all but $5 million of the money on casino lands; the remaining $5 million was permitted only for buying housing land, not to build a truck stop.

85. Separately, the Act permitted acquisitions for "restricted fee" status only for land inside SNI's aboriginal territory, or in proximity to former reservation land. 25 U.S.C. § 1774f(c).

86. The Act expressly defines "Seneca Nation" to mean "the Seneca Nation of Indians of the Allegany, Cattaraugus, and Oil Spring Reservations." *Id.* § 3(7).

87. The Settlement Act requires the SNI to provide notice to state and local governments when the Seneca Nation is seeking restricted fee status of qualifying land purchased with SNSA Money.

88. The Seneca Erie Gaming Corporation purchased the Site from Ramcol Fibres, Inc. in 2007.

89. On November 30, 2022, the Seneca Erie Gaming Corporation sold the Site to the SNI for $326,000. The quitclaim deed transferring title identifies the Seneca Erie Gaming Corporation as a "governmental instrumentality of the Seneca Nation of Indians." Ex. 5, p. 2.

90. By letter dated December 21, 2022, SNI informed then-Mayor of the City of Buffalo, Byron Brown, that it was "prepared" to submit land "commonly known as the Miami Street Parcels" to the Department of the Interior for restricted-fee consideration. Ex. 3.

91. This "notice" letter from SNI came one day after the onset of the historic and deadly blizzard that consumed government attention and resources both during the week-long emergency and for weeks of aftermath.

92. The letter claimed the "Miami Street Parcels" were "in near proximity to the former Buffalo Creek Reservation and the existing facility that was approved pursuant to Section 11(a)(2) of the Seneca Nation-New York [Gaming] Compact." *Id.*

93. The letter concluded: "the Nation used Settlement Act funds to purchase the Miami Street Parcels and is now prepared to submit the Miami Street Parcels to the Department of the Interior for confirmation of their status as restricted fee." *Id.*

94. The letter did not identify any specific parcel of land, nor did it provide substantive information or evidence to show the un-specified land was actually purchased with Settlement Act money or on or proximate to a qualifying reservation.

95. By Decision dated February 14, 2023, the DOI accepted SNI's application to place the "Miami Street Parcels" into restricted fee status, accepting without analysis or inquiry into whether SNI actually acquired the Site using SNSA Money—or if any such funds even still existed—and without any analysis as to whether the Site actually sat on or proximate to reservation territory as defined by the Act. *See* Ex. 2.

**FIRST CAUSE OF ACTION**

**The DOI Decision to Permit "Restricted Fee" Status for the Site was Arbitrary and Capricious and Contrary to Law Because SNI Did not Acquire the Site with SNSA Money.**

96. The City repeats and realleges the foregoing paragraphs as if fully set forth herein.

97. The Act applies only to acquisitions made with "funds appropriated pursuant to" the Act. If land is not purchased using SNSA Money, the parcel acquired cannot be placed into restricted fee status.

98. The Site was not acquired with SNSA Money.

99. The SNSA Money was depleted decades ago through prior purchases of land, including parcels in Niagara Falls and in Buffalo to build casinos.

100. The Compact mandated that these be the final Settlement Act purchases by requiring SNI to use "all but $5,000,000" of remaining SNSA Money to buy the

casino parcels.

101. The Compact obligated SNI to use the remaining $5,000,000 to purchase housing for members of the Seneca Nation on historical reservations.

102. There was no SNSA Money available to acquire the Site twenty years later in December 2022.

103. On information and belief, subsequent audits conducted by the State of New York prior to December 2022 confirmed that no SNSA Money remained.

104. In the Decision, the Department of the Interior does not analyze the contention that SNI "used Settlement Act funds" to acquire the Site.

105. To the contrary, the Decision appears to accept the bare representation that SNI paid for the Site with money held in an account labeled "Settlement Act funds" from the 1990 statute. Ex. 2, p. 2. Yet at the same time, public records including the Compact unequivocally stated that SNI had exhausted the SNSA Money by purchasing its Western New York casino properties.

106. Further, the Decision accepts the narrative that the SNI "purchased" the Site with SNSA Money, even while SNI admitted it had acquired the Site from the Seneca Erie Gaming Corporation—self-described as a "government instrumentality" of SNI—meaning SNI acquired the Site from itself.

107. The Decision actually cites as *supporting* evidence a series of self-serving statements with no apparent evidence to support them.

108. The Decision accepts the bare representation that the "purchase" of the Site was made by moving funds "derived from the Seneca Settlement Act Funds" from one SNI Gaming Corporation account to another. Both accounts were owned and controlled by SNI instrumentalities, such that no money—whatever its source—actually

changed hands.

109. DOI determined that "Settlement Act Funds" were used to buy the Site based on nothing more than the "Settlement Funds" label that SNI assigned to one of the accounts. Ex. 1, p. 2.

110. The Decision by the Secretary was therefore arbitrary and capricious, as it did not address this question whatsoever, and instead simply accepted SNI's claim that SNSA Money was used.

111. The Decision did not apply the law and was therefore arbitrary and capricious and should be vacated.

## SECOND CAUSE OF ACTION

### The DOI Decision to Permit Restricted Fee Status for the Site was Arbitrary and Capricious and Contrary to Law Because the Site does Not Satisfy the Geographic Predicates of 25 USC 1774f(c).

112. The City repeats and realleges the foregoing paragraphs as if fully set forth herein.

113. Section 1774f(c) of the Settlement Act requires that any land acquired with SNSA Money be located either within SNI's aboriginal area in the State of New York or within or in near proximity to former reservation land.

114. The Site does not satisfy these conditions.

115. On information and belief, the City of Buffalo is not within the SNI's aboriginal area.

116. At the time of the passage of the Act in 1990, the Allegany, Cattaraugus and Oil Springs Reservations were the only remaining reservations of the Seneca Nation.

117. The Site is not in near proximity to any of the reservations to which the

Settlement Act applies: the Allegany, Cattaraugus, and Oil Springs Reservations.

118. The legislative history of the Settlement Act illustrates that the Settlement Act is limited to those reservations defined in the act.

119. Reading the Settlement Act to apply to reservation territory aside from the three reservations identified in the text of the Act would violate the rules of statutory construction because there would be no reason to list specific reservations—i.e., Allegany, Cattaraugus, and Oil Springs—unless the Act was limited to those reservations.

120. Further, even if there were qualified reservation territory within the City of Buffalo, SNI expressly represented that the only piece of land where it would invoke the Settlement Act was on its casino land in Buffalo.

121. Specifically, SNI represented to the City that "except for the Seneca Buffalo Creek Territory,"—i.e., the 9-acre parcel at 1 Fulton Street where SNI built and now operates a casino—"no land in the City of Buffalo will be acquired utilizing the provisions of the Seneca Nation Land Claims Settlement Act to implement Compact requirements, including requirements of any successor Compact, to build and construct their class III gaming operation in the City of Buffalo." Ex. 4 § 9(c) (emphasis added).

122. The 9-acre parcel where SNI built a casino in Buffalo is separate from and is not contiguous with or adjacent to the Site.

123. Therefore, by SNI's own representations and the plain words of the Settlement Act—which limits acquisitions to Allegany, Cattaraugus, and Oil Springs Reservations—the Site is not located on qualified territory for restricted fee acquisition.

124. Again, the Decision did not analyze this question and instead accepted SNI's position on this requirement without question or criticism.

**WHEREFORE,** the City of Buffalo requests judgment as follows:

i. On the First Cause of Action: Vacating the Decision made by the DOI to permit the land to be held in restricted fee status because the Site was not acquired with funds appropriated pursuant to the Settlement Act as required by 25 U.S.C. §§1774f(c).

ii. On the Second Cause of Action: Vacating the Decision made by the Secretary to permit the Site to be held in restricted fee status because the Site does not meet the conditions precedent required by 25 U.S.C. §§1774f(c), rendering the Decision arbitrary, capricious, and contrary to law.

iii. Granting the City of Buffalo such other and further relief as the Court deems just and proper.

Dated: Buffalo, New York
October 8, 2026

ROSA ALINA PIZZI, ESQ.
Corporation Counsel

By.: s/ William V. Rossi
William V. Rossi
Deputy Corporation Counsel
*Attorneys for the City of Buffalo*
65 Niagara Square
1100 City Hall
Buffalo, New York 14202
716-851-4312